**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 21, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

E.W.; I.W.,

     Plaintiffs - Appellants,

v.

HEALTH NET LIFE INSURANCE
COMPANY; HEALTH NET OF
ARIZONA, INC.,

     Defendants - Appellees.

------------------------------------------

THE NATIONAL HEALTH LAW
PROGRAM; THE KENNEDY FORUM,

     Amici Curiae.

No. 21-4110

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:19-CV-00499-TC)**

_____

Brian S. King (Tera J. Peterson with him on the briefs), Brian S. King P.C., Salt Lake City, Utah, for Plaintiffs-Appellants.

Michael W. Lieberman (Samuel Hunt Ruddy with him on the brief), Crowell & Moring LLP, Washington, DC, for Defendants-Appellees.

Abigail K. Coursolle, National Health Law Program, Los Angeles, California, filed an amicus curiae brief for the National Health Law Program and the Kennedy Forum.

_____

Before **HOLMES**, Chief Judge, **McHUGH** and **EID**, Circuit Judges.

_____

**HOLMES**, Chief Judge.

_____

Plaintiff-Appellant E.W. was a participant in an employer-sponsored health insurance plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461.  E.W.'s daughter, Plaintiff-Appellant I.W., was a beneficiary of E.W.'s plan.  From September 2016 through December 2017, I.W. received treatment in connection with mental health challenges and an eating disorder at Uinta Academy ("Uinta"), an adolescent residential treatment center in Utah.  In January 2017, Defendants-Appellees Health Net Insurance Company and Health Net of Arizona, Inc. (collectively, "Health Net," "Defendants," or "Appellees") began covering I.W.'s treatment under E.W.'s ERISA plan (the "Plan").  The Plan only covered treatment that was medically necessary under a definition provided in the Plan for purposes of all types of medical treatment.

Effective February 23, 2017, Health Net determined I.W.'s care at Uinta was no longer medically necessary, and it denied coverage from that day forward.  In assessing whether to discontinue coverage, Health Net applied the McKesson InterQual Behavioral Health 2016.3 Child and Adolescent Psychiatry Criteria (the "InterQual Criteria"), which are designed to determine whether continued care at a residential treatment center is medically necessary.  As relevant here, under the InterQual Criteria, care is medically necessary if, within the previous week, the patient satisfies any one of several criteria relevant to either a serious emotional

2

disturbance or an eating disorder.  Health Net determined I.W. did not satisfy the InterQual Criteria within the relevant period and notified Plaintiffs in a letter dated March 1, 2017.

Plaintiffs allegedly did not receive Health Net's March 2017 denial letter, and I.W. remained at Uinta until December 2017, when she was formally discharged. After receiving notice in May 2018 that Health Net had denied coverage effective February 23, 2017, Plaintiffs appealed the decision.  Health Net again determined I.W. did not satisfy the InterQual Criteria during the relevant period and upheld its initial denial.  Plaintiffs then appealed to an external reviewer, which upheld the decision to deny coverage.

Having exhausted their administrative remedies, Plaintiffs filed suit in the District of Utah, asserting two claims.  First, they alleged Health Net violated ERISA, 29 U.S.C. §§ 1104(a)(1), 1132(a)(1)(B), 1133(2), by failing to comply with its fiduciary obligations to act solely in I.W.'s interest and by failing to conduct a full and fair review of her claim for benefits.  Second, Plaintiffs alleged Health Net violated the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA" or the "Parity Act"), 29 U.S.C. §§ 1132(a)(3), 1185a(a)(3)(A)(ii), by imposing limitations on coverage for mental health treatment that it did not apply to analogous medical or surgical treatment.  Defendants filed a motion to dismiss for failure to state a claim, which the district court denied as to the ERISA claim but granted with respect to the MHPAEA claim.  Both parties then filed

3

cross motions for summary judgment on the remaining ERISA claim.  The district court denied Plaintiffs' motion and granted summary judgment to Health Net.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **affirm** the district court's decision granting summary judgment to Health Net on Plaintiffs' ERISA claim, but we **reverse** its decision dismissing the MHPAEA claim, and we **remand** for further proceedings consistent with this opinion.

# I

## A

I.W. began experiencing behavioral and mental health challenges when she was eleven years old, shortly after her family moved from Utah to Arizona.  She had trouble making friends, and her grades began to drop substantially.  As a result, she became depressed, engaged in self-harm, and developed anorexia and bulimia.

In 2015, a psychiatrist diagnosed I.W. with "[m]ajor [d]epression" and "[g]eneralized anxiety disorder," R., Vol. 32, at 252 (Adult Evaluation Rep. by Dr. Daniel Amen, dated Oct. 23, 2015), in response to which she began therapy and psychiatric treatment.  However, I.W.'s mental health continued to decline, and in 2016, she attempted suicide on five occasions, leading her counselor and psychiatrist to "recommend[] a higher level of care," *id.*, Vol. 32, at 264 (Letter of Med. Necessity from Dr. Lisa Bravo, dated Aug. 15, 2018).  I.W. was admitted to ViewPoint Center, a psychiatric hospital for teens, where she underwent an eight-week evaluation.  In a report generated following her stay at ViewPoint, I.W.'s treatment team diagnosed her with persistent depressive disorder with recurrent

4

major depressive episodes, generalized anxiety disorder, an unspecified eating disorder, mild attention deficit hyperactivity disorder, parent-child relational problems, non-suicidal self-injury, and suicidal behavior disorder.  The treatment team recommended that I.W. enter a residential treatment center or therapeutic boarding school.

In September 2016, I.W. was admitted to Uinta, an adolescent mental health residential treatment center.  During I.W.'s time at Uinta, staff provided monitoring and treatment in connection with her eating disorder.  For periods during the first eight months of her stay, Uinta staff placed I.W. "on arms" during meals, meaning that staff supervised her to ensure she did not restrict her food intake or purge what she ate.  *E.g.*, *id.*, Vol. 13, at 224 (Uinta Daily Log for I.W., dated Apr. 17, 2017).

I.W. also continued to struggle behaviorally.  In February 2017, staff caught her recreationally drinking Benadryl and cough syrup, and I.W. subsequently "romanticiz[ed] . . . g[etting] high" several months later.  *Id.*, Vol. 41, at 31 (Uinta Therapy Progress Notes for I.W., dated Aug. 4, 2017).  I.W. also maintained a sexual relationship with a peer in violation of Uinta's rules.  And she continued seeking attention by faking fainting spells, a behavior that predated her admission to Uinta.

Approximately seven months into her stay at Uinta, I.W.'s treatment team prepared a "Treatment Plan Review" ("TPR"), which summarized her progress toward each treatment goal.  *Id.*, Vol. 13, at 208–09 (Uinta Treatment Plan Rev. for I.W., dated Apr. 12, 2017).  The TPR reported that I.W. was "developing skills to effectively manage her anxiety" and that "her level of anxiety ha[d] decrease[d]" but

that she still struggled to manage her anxiety without assistance from staff members. *Id.* at 208.  It also reported continuing signs of an eating disorder, including further weight loss, and it stated that I.W. remained "on arms" during and after meals.  *Id.* Accordingly, the TPR recommended that I.W. "continue her treatment at Uinta" and explained that "[i]f she [was] . . . discharge[d] at [that] time, it [was] highly probable that [she] would relapse and re-engage in unhealthy and risky behaviors."  *Id.* at 209.

On December 14, 2017, approximately fifteen months after I.W. entered Uinta, her treatment team concluded that she had "met her therapy goals" and recommended discharging her from the residential treatment center.  *Id.*, Vol. 5, at 51 (Uinta Discharge Summ. for I.W., dated Dec. 14, 2017).  Upon returning home, the treatment team recommended that I.W. "participate in an Intensive Out-Patient Program" and "continue to participate in individual and family therapy on a weekly basis."  *Id.*

**B**

From the date she was admitted to Uinta through December 31, 2016, an insurance provider that is not a party to this litigation covered I.W.'s treatment. Starting on January 1, 2017, I.W.'s treatment was covered by an insurance plan issued by Defendant-Appellee Health Net Life Insurance Company and administered by Defendant-Appellee Health Net of Arizona, Inc., through its subsidiary Managed Health Network, LLC.  *See id.*, Vol. 4, at 270 (Letter from Health Net to I.W., dated Nov. 19, 2018).  The Plan is governed by ERISA.  *See id.*, Vol. 1, at 14–15 ¶¶ 2–3

6

(Compl., filed July 16, 2019). I.W.'s father, E.W., participated in the Plan through his employer, and I.W. was a beneficiary. *Id.* at 15 ¶ 3.

Except for preventive services, the Plan only covered services that were "[m]edically [n]ecessary," *id.*, Vol. 4, at 142 (Health Net Evid. of Coverage), which the Plan defined as:

> health care services that a Physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an Illness, Injury, disease or its symptoms, and that are:
>
> 1.      In accordance with generally accepted standards of medical practice;
>
> 2.      Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's Illness, Injury or disease; and
>
> 3.      Not primarily for the convenience of the patient, Physician, or other health care Provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's Illness, Injury or disease.

*Id.* at 244. The Plan defined "generally accepted standards of medical practice" as "standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations, the views of Physicians practicing in relevant clinical areas and any other relevant factors." *Id.*

Though not specified in the Plan itself, Health Net uses the InterQual Criteria to determine whether remaining at a residential treatment center beyond fifteen days

7

is medically necessary. *See id.*, Vol. 3, at 107 (Letter from Health Net to the Parents of I.W., dated Mar. 1, 2017); *id.* at 144 (Notes of Care Activities for I.W., dated Mar. 1, 2017); *see also id.* at 34, 36–38 (InterQual Criteria, dated 2016). Under the InterQual Criteria, continued care after fifteen days is medically necessary if, within the past week, the patient displays symptoms of either an "[e]ating [d]isorder" or a "[s]erious emotional disturbance." *Id.* at 36–37.

For an "[e]ating [d]isorder," the patient must display at least one of the following five symptoms: (1) "[p]ronounced body image distortion"; (2) inability "to judge [the] amount of food to eat at all meals"; (3) inability "to make appropriate food choices without assistance or supervision at all meals"; (4) "[u]nachieved prescribed weight or behaviors to prevent weight gain," including "[a]ttempting to restrict at meals even when supervised by staff," "[d]iscarding food from most meals," "food refusal or persistent decline in oral intake," "[r]estricting at meals when not supervised," and "[w]eight gain less than [two pounds] per week and consuming prescribed calories for therapeutic weight gain"; or (5) "uncontrolled ritualistic or compulsive eating behavior at all meals." *Id.*

For a "[s]erious emotional disturbance," the patient must satisfy at least one of the following conditions, or display at least one of the following symptoms, within the past week: (1) "[a]ggressive or assaultive behavior"; (2) "[a]ngry outbursts"; (3) "[d]epersonalization or derealization"; (4) "[d]estruction of property"; (5) becoming "[e]asily frustrated and impulsive"; (6) "[h]omicidal ideation without intent"; (7) "[h]ypervigilence or paranoia"; (8) "[n]onsuicidal self-injury"; (9) "[p]ersistent rule

violations"; (10) "[p]sychiatric medication refractory or resistant and symptoms increasing or persisting"; (11) "[p]sychomotor agitation or retardation"; (12) running away "from [a] facility or while on home pass"; (13) "[s]exually inappropriate" behavior; (14) "[s]uicidal ideation without intent"; or (15) discharge is planned within the next week but the treatment goals are not yet met or the patient's family or guardian requests "further intervention." *Id.* at 37.

## C

On or around February 23, 2017, Health Net engaged Prest & Associates ("Prest"), an independent review organization, to conduct a peer-to-peer review assessing whether I.W.'s care at Uinta remained medically necessary. Dr. Diana Antonacci, a psychiatrist affiliated with Prest, conducted the review, which covered I.W.'s medical records and included a discussion with one of I.W.'s physicians at Uinta. Notes reflecting Dr. Antonacci's findings provided, *inter alia*, that:

> 1.    [I.W.] has no suicidal or homicidal ideation. There are no psychotic symptoms. There is no evidence of grave disability. There has been no recent aggression of [sic] severe agitation. There are no severe mood symptoms.
>
> 2.    There are no comorbid substance use concerns. There are no significant medical problems. The patient is compliant w/ medications. No side effects are documented.

*Id.* at 143–44. Dr. Antonacci concluded that as of February 23, 2017, I.W. did not meet the InterQual Criteria for a residential treatment level of care. *Id.* at 144. Dr. Antonacci further found "no evidence that [I.W.] continue[d] to require 24-hour-a-day/7-day-a-week supervision to make progress in her goal areas" and that "[c]are

9

could continue in a less restrictive setting," such as an "intensive outpatient" program. *Id.*

Dr. Jay Butterman, a psychiatrist affiliated with Health Net, reviewed Dr. Antonacci's findings as well as "I.W.'s medical records, input from I.W.'s treatment team," and the InterQual Criteria. *Id.*, Vol. 2, at 89–90 (Aff. of Dr. Jay Butterman, dated Mar. 25, 2021). He likewise "concluded it was no longer medically necessary for I.W. to continue receiving extended residential treatment as of February 23, 2017." *Id.* at 90.

On March 1, 2017, Health Net sent a letter to I.W.'s parents providing notice that it would not cover I.W.'s care at Uinta for services rendered on or after February 23, 2017. The letter explained that Health Net determined I.W.'s ineligibility for continued coverage using the "McKesson InterQual medical necessity standards." *Id.*, Vol. 3, at 107. According to the letter, "[t]hese standards state that there must be reports within the last week of physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, or suicidal or homicidal ideation." *Id.* Based on medical records submitted to Health Net, the letter stated that I.W. was "not having any of these symptoms or behaviors." *Id.* Rather, she had reportedly "learned many healthy coping skills" and was "working on strategies to control her anxiety." *Id.* Accordingly, the letter reported that continued care at Uinta was no longer medically necessary and recommended that I.W. instead enter an "Adolescent Mental Health Partial Hospital Program." *Id.* at 108.

In a letter sent to Health Net on May 10, 2018, after I.W. was discharged, I.W.'s parents claimed that they never received Health Net's March 2017 letter. I.W.'s parents requested that Health Net "complete a full and fair review of [I.W.'s] medical records"—which they attached—"and issue a valid determination letter." *Id.*, Vol. 13, at 168 (Letter from A.W. (I.W.'s mother) to Health Net, dated May 10, 2018). On June 8, 2018, Health Net sent a letter to I.W.'s parents notifying them that Health Net would review its determination. Health Net's letter attached its March 2017 coverage-denial letter and the InterQual Criteria, and it requested that I.W.'s parents submit any additional information pertaining to their appeal by June 13, 2018.

Health Net assigned Dr. Andrei Jaeger, an affiliated psychiatrist, to conduct the review. Like Dr. Antonacci and Dr. Butterman, Dr. Jaeger concluded that continued treatment at Uinta was not medically necessary as of February 23, 2017. *See id.*, Vol. 5, at 40–43 (Rev. by Dr. Andrei Jaeger, dated June 6, 2018). Based on Dr. Jaeger's findings and having received no further information from I.W.'s parents, Health Net upheld its initial decision to deny coverage, and it sent a letter notifying I.W.'s parents of Health Net's decision. The letter explained that Health Net based its decision on the InterQual Criteria, under which "there must be reports within the last week of either physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, [or] suicidal or homicidal ideation." *Id.* at 33 (Letter from Health Net to A.W., dated July 16, 2018). Because I.W. had not experienced "any of these symptoms or behaviors" within the week

11

prior to February 23, 2017, the letter advised that I.W.'s circumstances "did not meet [the] medical necessity criteria." *Id.* at 33–34.

After receiving Health Net's July 2018 letter, I.W. sent a letter to Health Net requesting an independent external review. The letter requested that the reviewer "not utilize the InterQual Criteria utilized by Health Net in their previous reviews" because they "have not been reviewed by an independent review organization" and "require patients to exhibit acute symptoms in order to qualify for subacute levels of care." *Id.*, Vol. 32, at 168 (Letter from I.W. to Health Net, dated Nov. 14, 2018). Instead, I.W. requested that the reviewer "rely on [her] plan's definition of medical necessity." *Id.*

Health Net forwarded the request to the Arizona Department of Insurance, which engaged MAXIMUS Federal Services to conduct the review. An independent psychiatrist reviewed the Plan, I.W.'s medical records, the InterQual Criteria, and materials pertinent to I.W.'s appeals. *See id.*, Vol. 5, at 16–18 (Letter from MAXIMUS to Ariz. Dep't of Ins., dated Dec. 19, 2018). Under the InterQual Criteria, the reviewer explained that "there must be documentation within the last week of either physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, [or] suicidal or homicidal ideation." *Id.* at 18. Based on I.W.'s medical records, the reviewer found that I.W. "did not display any of these such behaviors within the specified time," "concluded that the services were not medically necessary," and recommended upholding Health Net's determination. *Id.* at 17–18.

**D**

Having exhausted the prelitigation appeal requirements under the Plan and ERISA, Plaintiffs filed a complaint asserting two counts against Health Net in the District of Utah. In Count 1, they alleged Health Net violated ERISA, which requires "a fiduciary [to] discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), and requires covered plans to provide "a full and fair review by the appropriate named fiduciary of [a] decision denying [a] claim," 29 U.S.C. § 1133(2). Plaintiffs alleged Health Net failed to "act solely in [I.W.'s] interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of [I.W.'s] claims." R., Vol. 1, at 22 ¶ 33.

In Count 2, Plaintiffs alleged Health Net violated MHPAEA, 29 U.S.C. §§ 1132(a), 1185a, and regulations implementing the statute. Under the statutory provision relevant here, covered insurance plans must ensure that "treatment limitations applicable to . . . mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and [that] there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits." 29 U.S.C. § 1185a(a)(3)(A)(ii); *see* 29 C.F.R. § 2590.712(c)(4)(i). Plaintiffs alleged that "the Plan's medical necessity criteria for intermediate level mental health treatment benefits are more stringent or

restrictive than the medical necessity criteria the Plan applies to intermediate level medical or surgical benefits." R., Vol. 1, at 23 ¶ 39. In particular, they alleged:

> 40. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for [I.W.'s] treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Health Net exclude or restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner Health Net excluded coverage of treatment for [I.W.] at Uinta.

> 41. The actions of Health Net and the Plan requiring that [I.W.] satisfy acute care medical necessity criteria in order to obtain coverage for residential treatment violates MHPAEA because the Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

*Id.* at 23.

Health Net filed a motion to dismiss for failure to state a claim, which the district court denied as to Plaintiffs' ERISA claim in Count 1 but granted as to Plaintiffs' MHPAEA claim in Count 2. *See* R., Vol. 1, at 165 (Dist. Ct. Order, filed May 19, 2020). The parties then filed cross motions for summary judgment on Plaintiffs' remaining ERISA claim, and the district court granted summary judgment to Health Net. *See* R., Vol. 2, at 191 (Dist. Ct. Order & Mem., filed Sept. 10, 2021). This appeal followed.

## II

Plaintiffs appeal the district court's order dismissing their MHPAEA claim and its decision granting summary judgment to Health Net on their ERISA claim. We address these issues in turn. First, we hold that Plaintiffs stated a claim under MHPAEA, and thus we reverse the district court's decision dismissing the MHPAEA claim, and remand for further proceedings. Second, we affirm the district court's decision granting summary judgment to Health Net on the ERISA claim, concluding the district court properly determined Health Net did not violate ERISA in denying continued benefits to I.W.

## A

We review de novo a district court's order granting a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Stan Lee Media, Inc. v. Walt Disney Co.*, 774 F.3d 1292, 1296 (10th Cir. 2014). In doing so, we must "accept all . . . well-pleaded allegations as true and view them in the light most favorable to" Plaintiffs. *Warnick v. Cooley*, 895 F.3d 746, 750 (10th Cir. 2018).

"Dismissal under Rule 12(b)(6) is appropriate only if the complaint . . . lacks enough facts to state a claim to relief that is plausible on its face." *Abdi v. Wray*, 942 F.3d 1019, 1025 (10th Cir. 2019) (quoting *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 764 (10th Cir. 2019)). Plaintiffs "need not provide 'detailed factual allegations,'" but they must allege "enough factual detail to provide 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Warnick*, 895 F.3d at 751 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

15

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Accordingly, in examining a complaint under Rule 12(b)(6), we will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

Plaintiffs argue they stated a plausible claim under MHPAEA. We begin by setting out the test that governs their MHPAEA claim. Applying this test, we conclude that the district court erred in determining that Plaintiffs failed to state a claim.

1

MHPAEA is an amendment to ERISA. *See N.R. ex rel. S.R. v. Raytheon Co.*, 24 F.4th 740, 746 (1st Cir. 2022). Congress enacted the statute "to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016).

We have not addressed in a precedential decision whether MHPAEA provides a separate cause of action. However, the First Circuit has concluded that the right of action that exists under ERISA, 29 U.S.C. § 1132(a)(3),[1] provides a vehicle through

---

[1] As relevant here, ERISA authorizes civil actions "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any

which private parties may assert MHPAEA claims. *See N.R.*, 24 F.4th at 749 & n.3 (explaining "the defendants agree that § 1132(a)(3) is the avenue to pursue a Parity Act claim" and holding that the plaintiff stated a claim under MHPAEA). Health Net "does not concede that MHPAEA establishes a private cause of action." Aplees.' Resp. Br. at 15 n.4. However, notably, Health Net does not seek to challenge through argument here whether MHPAEA allows plaintiffs to pursue a private claim for relief under § 1132(a)(3). In other words, Health Net makes no meaningful argument in its briefing that challenges the propriety of Plaintiffs asserting here a MHPAEA claim under § 1132(a)(3). For purposes of the appeal, therefore, the question of the viability of such a claim is uncontested, and we have no need to opine on the matter. We resolve the parties' dispute on the assumption that, as a categorical matter, such a claim is viable.

MHPAEA imposes coverage requirements on "a group health plan (or health insurance coverage offered in connection with such a plan) that provides both medical and surgical benefits and mental health or substance use disorder benefits." 29 U.S.C. § 1185a(a)(3)(A). As relevant here, covered plans must ensure that: (1) "treatment limitations applicable to . . . mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage)";

---

provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

and (2) "there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits." *Id.*

A "'treatment limitation' includes limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment." *Id.* § 1185a(a)(3)(B)(iii). Pursuant to authority conferred under MHPAEA, *see id.* § 1185a(a)(7)(A), agency regulations have been issued, providing that the statute covers both "quantitative treatment limitations" ("QTL") and "nonquantitative treatment limitations" ("NQTL"), 29 C.F.R. § 2590.712(a). Whereas QTL "are expressed numerically (such as 50 outpatient visits per year)," NQTL "otherwise limit the scope or duration of benefits for treatment under a plan or coverage." *Id.* With respect to NQTL, "any processes, strategies, evidentiary standards, or other factors used in applying . . . [NQTL] to mental health or substance use disorder benefits" must be "comparable to, and . . . applied no more stringently than, the [same factors] . . . used in applying the limitation with respect to medical/surgical benefits." *Id.* § 2590.712(c)(4)(i).

Neither our Circuit nor any others have defined the elements of a MHPAEA claim. *See, e.g.*, *Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1174 (D. Utah 2019) ("[T]here is no clear law on what is required to state a claim for a Parity Act violation."); *Nancy S. v. Anthem Blue Cross & Blue Shield*, No. 2:19-cv-00231, 2020 WL 2736023, at *3 (D. Utah May 26, 2020) ("[T]he Tenth Circuit has not promulgated a test to determine what is required to state a claim for a Parity Act violation . . . .") (unpublished); *Jonathan Z. v. Oxford Health Plans*,

18

No. 2:18-cv-383, 2020 WL 607896, at *13 (D. Utah Feb. 7, 2020) (same)

(unpublished).[2]

Lacking concrete guidance from the courts of appeals, district courts within

and outside this Circuit have adopted different tests.  Some district courts have

applied a test containing the following elements:

> (1) the relevant group health plan is subject to the Parity
> Act; (2) the plan provides both medical/surgical benefits and
> mental health or substance use disorder benefits; (3) the plan
> includes a treatment limitation for mental health or
> substance use disorder benefits that is more restrictive than
> medical/surgical benefits; and (4) the mental health or
> substance use disorder benefit being limited is in the same
> classification as the medical/surgical benefit to which it is
> being compared.

*Michael D.*, 369 F. Supp. 3d at 1174 (quoting *A.H. ex rel. G.H. v. Microsoft Corp.*

*Welfare Plan*, No. C17-1889, 2018 WL 2684387, at *6 (W.D. Wash. June 5, 2018)

(unpublished)); *see also Gallagher v. Empire HealthChoice Assurance, Inc.*, 339 F.

Supp. 3d 248, 256 (S.D.N.Y. 2018) (same).

More recently, district courts in this Circuit have transitioned to a three-part

test, which requires a plaintiff to:

> (1) identify a specific treatment limitation on mental health
> benefits; (2) identify medical/surgical care covered by the
> plan that is analogous to the mental health/substance abuse
> care for which the plaintiffs seek benefits; and (3) plausibly

---

[2]    We rely herein on certain persuasive unpublished decisions.  District
court decisions are of course not controlling law for us.  Moreover, we fully
recognize that even unpublished decisions issued by panels of our own Court are not
binding; they aid us only insofar as they are persuasive.  *See, e.g.*, *Bear Creek Trail,
LLC v. BOKF, N.A.,* 35 F.4th 1277, 1282 n.8 (10th Cir. 2022); *see also* FED. R. APP.
P. 32.1; 10TH CIR. R. 32.1.

allege a disparity between the treatment limitation on mental health/substance abuse benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog.

*David P. v. United Healthcare Ins. Co.*, No. 2:19-cv-00225, 2020 WL 607620, at *15 (D. Utah Feb. 7, 2020) (unpublished); *see also Annemarie O. v. United Healthcare Ins. Co.*, No. 1:20-cv-164, 2021 WL 2532947, at *2 (D. Utah June 21, 2021) (same) (unpublished); *Heather E. v. Cal. Physicians' Servs.*, No. 2:19-cv-415, 2020 WL 4365500, at *3 (D. Utah July 30, 2020) (same) (unpublished); *James C. v. Anthem Blue Cross & Blue Shield*, No. 2:19-cv-38, 2020 WL 3452633, at *2 (D. Utah June 24, 2020) (same) (unpublished); *Nancy S.*, 2020 WL 2736023, at *3 (same); *Ryland v. Blue Cross Blue Shield Healthcare Plan of Ga.*, No. CIV-19-807, 2020 WL 6531239, at *2 (W.D. Okla. July 17, 2020) (same) (unpublished).

In this case, the district court applied a standard that draws elements from both tests described *supra*: it required Plaintiffs to "allege that Defendants imposed a limitation on mental health benefits that is more restrictive than limitations they place on analogous medical/surgical benefits." R., Vol. 1, at 163. And at oral argument, the parties agreed we may apply a similar standard that combines elements from both tests applied in the district courts. *See* Oral Arg. at 02:50–03:46 (Plaintiffs agreeing); *id.* at 18:47–19:31 (Health Net agreeing).

Under the test to which the parties agreed at oral argument, a plaintiff must:

(1) [p]lausibly allege that the relevant group health plan is subject to MHPAEA;

20

(2) identify a specific treatment limitation on mental health or substance-use disorder benefits covered by the plan;

(3) identify medical or surgical care covered by the plan that is analogous to the mental health or substance-use disorder care for which the plaintiffs seek benefits; and

(4) plausibly allege a disparity between the treatment limitation on mental health or substance-use disorder benefits as compared to the limitations that defendants would apply to the medical or surgical analog.

We lay out the basis for each of these elements in the text of MHPAEA before applying the test to Plaintiffs' claim.

With respect to the first element, MHPAEA's parity requirement applies to "a group health plan (or health insurance coverage offered in connection with such a plan)." 29 U.S.C. § 1185a(a)(3)(A). ERISA, in turn, provides specific definitions of a "group health plan" and "health insurance coverage." *Id.* §§ 1191b(a)(1), (b)(1). Thus, to bring a claim under MHPAEA, a plaintiff must plausibly allege that the plan underlying her claim is one to which the statute applies.

The second element accounts for the fact that MHPAEA applies to "treatment limitations" that are "applicable to . . . mental health or substance use disorder benefits" covered under the plan. 29 U.S.C. § 1185a(a)(3)(A)(ii). As explained previously, the statute defines a "treatment limitation," *id.* § 1185a(a)(3)(B)(iii),

21

which regulations break into quantitative and non-quantitative categories, 29 C.F.R.

§ 2590.712(a). As such, under the statutory terms, plaintiffs must identify a

"treatment limitation" that satisfies the statutory definition and applies to mental

health or substance use disorder benefits.

The third element captures the comparison MHPAEA requires between the

treatment limitations applied to benefits for medical or surgical care and those

applied to benefits for care addressing mental health or substance-use disorders. *See*

29 U.S.C. § 1185a(a)(3)(A)(ii). MHPAEA itself does not explicitly require a

comparison between *analogous* forms of treatment, but such a requirement is

implicit. Indeed, comparing like categories is a quintessential feature of any

discrimination claim. *See, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802 (1973) (requiring, as an element of a prima facia claim under Title VII,

allegations that after the plaintiff was rejected for a position, "the position remained

open and the employer continued to seek applicants from *persons [with]*

*complainant's qualifications*" (emphasis added)); *Ashaheed v. Currington*, 7 F.4th

1236, 1249 (10th Cir. 2021) (explaining that the Equal Protection Clause of the

Fourteenth Amendment "is 'essentially a direction that all persons *similarly situated*

should be treated alike'" (emphasis added) (quoting *A.M. ex rel. F.M. v. Holmes*, 830

F.3d 1123, 1166 (10th Cir. 2016))). As we explain further herein when analyzing

Plaintiffs' claim, MHPAEA's implementing regulations specify the types of

limitations that are comparable for purposes of QTL and NQTL, but we think it

22

readily apparent from the statute itself that MHPAEA requires a comparison between forms of treatment that are analogous.

Finally, the fourth element—which calls for allegations of a disparity—follows from the type of comparison MHPAEA requires. The statute prohibits limitations on benefits for mental health or substance-use disorder treatment that are "more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan." 29 U.S.C. § 1185a(a)(3)(A)(ii). It also prohibits plans from imposing "separate treatment limitations" on benefits for mental health or substance-use disorder treatment that do not apply to benefits for medical or surgical care. *Id.* Both prohibitions zero in on disparities in limitations applied to benefits for medical or surgical care versus those applied to benefits for mental health or substance-use disorder treatment.

Within the confines of the test we have discussed, a plaintiff may challenge treatment limitations either facially or as applied. *See* 29 C.F.R. § 2590.712(c)(4)(i) (specifying that with respect to NQTL, MHPAEA's parity requirement applies to "the terms of the plan (or health insurance coverage) as written *and in operation*" (emphasis added)); *see also Michael W. v. United Behav. Health*, 420 F. Supp. 3d 1207, 1235 (D. Utah 2019) ("[E]ven if plaintiffs do not plead a plausible *facial* Parity Act challenge to an insurance plan on its own terms, they may instead allege that the plan *as applied* by the insurance administrator violates the Parity Act."); *Nancy S.*, 2020 WL 2736023, at *3 ("[P]laintiffs often must plead 'as-applied' challenges to enforce their Parity Act rights when a disparity in benefits criteria occurs in

23

application rather than in the plan terms."); *Kurt W. v. United Healthcare Ins. Co.*, No. 2:19-cv-223, 2019 WL 6790823, at *4 (D. Utah Dec. 12, 2019) ("[D]isparate treatment limitations that violate the Parity Act can be either *facial* (as written in the language or the processes of the plan) or *as-applied* (in operation via application of the plan)." (citation omitted)) (unpublished).

A facial challenge focuses on the terms of a plan. *Cf. Nancy S.*, 2020 WL 2736023, at *3 (explaining that a plaintiff may bring as-applied challenges when "[t]reatment limitations are not necessarily evident on the face of an insured's plan terms"). A plaintiff must identify an express limitation on benefits for mental health or substance use disorder treatment and demonstrate a disparity compared to benefits for the relevant medical or surgical analogue. *See Jeff N. v. United HealthCare Ins. Co.*, No. 2:18-cv-00710, 2019 WL 4736920, at *3 (D. Utah. Sept. 27, 2019) (unpublished).

By contrast, as-applied challenges focus on treatment limitations that a plan applies "in operation." 29 C.F.R. § 2590.712(c)(4)(i). In an as-applied challenge, a plaintiff must plausibly allege that a "defendant differentially applies a facially neutral plan term." *Jeff N.*, 2019 WL 4736920, at *3–4 (quoting *Anne M. v. United Behav. Health*, No. 2:18-CV-808, 2019 WL 1989644, at *2 (D. Utah May 6, 2019)); *see also Vorpahl v. Harvard Pilgrim Health Ins. Co.*, No. 17-cv-10844, 2018 WL 3518511, at *4 (D. Mass. July 20, 2018) (holding that the plaintiff stated a MHPAEA claim by plausibly alleging the defendant "differentially applie[d] a facially neutral plan term") (unpublished).

24

Plaintiffs argue they have stated claims for both facial and as-applied MHPAEA challenges. *See* Aplts.' Opening Br. at 29. But in their Reply Brief, Plaintiffs concede that if we find they stated an as-applied claim, we need not reach their facial challenge. *See* Aplts.' Reply Br. at 3 n.2. Because we ultimately conclude Plaintiffs stated an as-applied MHPAEA claim, we need not reach their facial challenge on this appeal, and we turn directly to their as-applied challenge.

**2**

Plaintiffs allege Health Net committed an as-applied MHPAEA violation by determining I.W.'s eligibility for continued benefits using the InterQual Criteria. Under their theory, by applying the InterQual Criteria, Defendants required them to "satisfy acute [care] medical necessity criteria" to obtain coverage for residential treatment without "requir[ing] individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria." *See* Aplts.' Opening Br. at 29 (quoting R., Vol. 1, at 23 ¶ 41). As Plaintiffs elaborate:

> Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for [I.W.'s] treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Health Net exclude or restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner Health Net excluded coverage of treatment for [I.W.] at Uinta.

R., Vol. 1, at 23 ¶ 40.

Under the four-part test that we apply for purposes of resolving this case, there is no dispute that Plaintiffs have plausibly alleged that the Plan at issue here is subject to MHPAEA, thereby satisfying the first element. The dispute focuses on the remaining three elements. We conclude Plaintiffs' allegations with respect to each remaining element satisfy our pleading standards.

**a**

As to the second element, Plaintiffs have identified a specific treatment limitation on mental health benefits covered under the Plan. They alleged Defendants required them to satisfy "acute care medical necessity criteria" to receive benefits for treatment in a subacute care setting. *Id.* at 23 ¶ 41. This allegation concerns a NQTL, as it addresses a limitation on "the scope . . . of benefits for treatment under a plan or coverage," 29 C.F.R. § 2590.712(a), which "include[s] . . . [m]edical management standards limiting or excluding benefits based on medical necessity," *id.* § 2590.712(c)(4)(ii)(A). And, as we explain herein, Plaintiffs plausibly alleged that the InterQual Criteria capture acute conditions while residential treatment centers, as defined in the Plan, provide subacute care.

When interpreting an ERISA plan, we apply principles of construction from contract law. *See Flinders v. Workforce Stabilization Plan of Phillips Petrol. Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). Under those principles, we adhere to definitions the parties adopt and afford undefined terms their plain and ordinary meanings. *See Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1157

26

(10th Cir. 2007) (explaining "parties to a contract are [generally] free to define their terms in any manner they wish"); *see also Am. Tooling Ctr., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 895 F.3d 455, 459–60 (6th Cir. 2018) (applying Michigan law and explaining that if an insurance policy does not define a term, courts must interpret the term based on its ordinary meaning); *Prestwick Cap. Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 656 (7th Cir. 2013) ("Undefined contractual terms are typically afforded their plain and ordinary meanings . . . .").

Applying these principles of construction, we conclude Plaintiffs plausibly alleged that the InterQual Criteria are specific to acute care. The Plan defines an "[a]cute" condition as "the sudden onset of an Illness or Injury, or a sudden change in a person's health status, requiring prompt medical attention, but which is of limited duration." R., Vol. 4, at 44.[3] Plaintiffs allege that the InterQual Criteria required reports "within the last week of physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, or

---

[3]    Although courts "generally 'should not look beyond the confines of the complaint itself'" when deciding a Rule 12(b)(6) motion to dismiss, *MacArthur v. San Juan Cnty.*, 309 F.3d 1216, 1221 (10th Cir. 2002) (quoting *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 960 (10th Cir. 2001), *rev'd on other grounds*, 537 U.S. 79 (2002)), courts may consider "documents attached to or referenced in the complaint if they 'are central to the plaintiff's claim and the parties do not dispute the documents' authenticity,'" *Brokers' Choice of Am. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)). Plaintiffs refer to the Plan in their Complaint. *See, e.g.,* R., Vol. 1, at 14–15 ¶¶ 2–3. And the Plan is central to their MHPAEA claim, as it defines the various types of care and services—such as the terms "[a]cute," "residential treatment [center]," and "skilled nursing facility"—on which their MHPAEA claim relies. *Compare id.* at 19, 23 (referring to plan terms), *with id.*, Vol. 4, at 44, 57–58 (defining plan terms).

suicidal or homicidal ideation." *See id.*, Vol. 1, at 17 (quoting *id.*, Vol. 3, at 107).

Because these criteria focus on recently manifested or worsening conditions that

would likely require "prompt medical attention," *id.*, Vol. 4, at 44, they are plausibly

specific to acute care as defined in the Plan. Health Net does not dispute this point

on appeal.

Likewise, Plaintiffs also plausibly alleged that a residential treatment center

qualifies as a "sub-acute" care setting. The Plan defines a "Residential Treatment

Center" as "a twenty-four hour, structured and supervised group living environment

for children, adolescents or adults where psychiatric, medical and psychosocial

evaluation can take place, and distinct and individualized psychotherapeutic

interventions can be offered to improve their level of functioning in the community."

*Id.* at 57. Nothing in this definition focuses on "a sudden change in a person's health

status" that "require[es] prompt medical attention" for a "limited duration"—which

stands in stark contrast to the definition of "acute" condition. *Id.* at 44.

To the contrary, in ordinary parlance, a "living environment"—a term that the

Plan mentions—refers most naturally to a place one remains for an extended period.

"Living" in this sense refers to "occupy[ing] a home." *Live*, MERRIAM-WEBSTER

DICTIONARY, https://www.merriam-webster.com/dictionary/live (last visited Nov. 20,

2023) (providing "*living* in a shabby room" as an example). And a home is "one's

place of residence," *Home*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-

webster.com/dictionary/home (last visited Nov. 20, 2023), which is "the place where

one actually lives as distinguished from . . . a place of temporary sojourn,"

28

*Residence*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/residence (last visited Nov. 20, 2023).

For these reasons, Plaintiffs have plausibly alleged a treatment limitation on the mental health care covered under the Plan.

**b**

As for the third element, Plaintiffs identified medical or surgical care covered by the Plan that is analogous to the mental health and substance abuse care for which they seek benefits. As analogues, Plaintiffs allege coverage for services in "sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities." R., Vol. 1, at 23. We agree with Plaintiffs that inpatient skilled nursing facilities qualify as a relevant analog.

MHPAEA itself does not explicitly identify the types of medical or surgical care that are analogous to care at a residential treatment center for purposes of stating a claim. The statute simply requires plans to ensure "treatment limitations applicable to . . . mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan." 29 U.S.C. § 1185a(a)(3)(A)(ii). But MHPAEA directs the Departments of the Treasury, Labor, and Health and Human Services (the "Departments") to issue guidance designed to assist plans in complying with the statute. *See id.* § 1185a(a)(7)(A); *see also id.* § 1185a(g); *Danny P. v. Cath. Health Initiatives*, 891 F.3d 1155, 1158 (9th Cir. 2018) ("Congress has conferred upon certain agencies the power to issue rules that give guidance and information

29

regarding the application of the Parity Act . . . .").  And at least for purposes of this

case, the Departments promulgated regulations that specify the types of medical or

surgical care that is analogous to care at a residential treatment center.

As a general rule, the regulations provide as follows:

> A group health plan . . . that provides both medical/surgical
> benefits and mental health or substance use disorder benefits
> may not apply any financial requirement or treatment
> limitation to mental health or substance use disorder
> benefits in any classification that is more restrictive than the
> predominant financial requirement or treatment limitation
> of that type applied to substantially all medical/surgical
> benefits in the same classification.

29 C.F.R. § 2590.712(c)(2)(i).  The regulations then specify six benefit

"classifications" for use in applying the parity requirement: (1) inpatient, in-network;

(2) inpatient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-

network; (5) emergency care; and (6) prescription drugs.  *See id.*

§ 2590.712(c)(2)(ii)(A).

The regulations also provide further guidance that is specific to both "financial

requirements and [QTLs]," on one hand, and NQTLs, on the other.  *Id.*  With respect

to financial requirements and QTLs, the regulations focus on "the predominant

financial requirement or [QTL] . . . applie[d] to substantially all medical/surgical

benefits in the same classification."  *Final Rules Under the Paul Wellstone and Pete

Domenici Mental Health Parity and Addiction Equity Act of 2008*, 78 Fed. Reg.

68240, 68245 (Nov. 13, 2013) [hereinafter, "*Final Rules*"].  The regulations define

the terms "predominant" and "substantially all," 29 C.F.R. § 2590.712(c)(3)(i), and

those terms serve as the focal point when comparing medical or surgical care to care for mental health or substance use disorders in the context of a financial requirement or a QTL, *see Final Rules*, 78 Fed. Reg. at 68245.

By contrast, the regulations adopt a different parity standard for NQTLs. *See id.* (explaining that the regulations "provide different parity standards with respect to quantitative treatment limitations and NQTLs"). With respect to NQTLs, a plan

> may not impose a [NQTL] with respect to mental health or substance use disorder benefits in any classification unless . . . any processes, strategies, evidentiary standards, or other factors used in applying the [NQTL] to mental health or substance use disorder benefits *in the classification* are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits *in the classification*.

29 C.F.R. § 2590.712(c)(4)(i) (emphasis added). Thus, the parity analysis for NQTLs does not contain any inquiry into the "predominant" limitation applied to "substantially all" medical or surgical benefits. Instead, for NQTLs, the regulations simply require a comparison between medical or surgical care and care for mental health or substance use disorders that fall within the same "classification." *Id.* And the six classifications specified in the regulations are "the only classifications used in applying the rules" governing parity. *Id.* § 2590.712(c)(2)(ii)(A).

For purposes of identifying analogous treatments, we need not decide—as a general matter—whether MHPAEA or its implementing regulations require anything beyond a comparison between benefits in the same "classification." Even assuming they do, the Final Rules specify at least one type of medical or surgical care that is

31

analogous to care at a residential treatment center. In the background section, the Final Rules acknowledged comments requesting that "the Departments clarify how MHPAEA affects the scope of coverage for intermediate services (such as residential treatment, partial hospitalization, and intensive outpatient treatment) and how these services fit within the six classifications." *Final Rules*, 78 Fed. Reg. at 68246.

By way of response, the Final Rules explain that "[p]lans and issuers must assign covered intermediate mental health and substance use disorder benefits to the existing six benefit classifications in the same way that they assign comparable intermediate medical/surgical benefits to these classifications." *Id.* at 68247. As one example, the rules explain that "if a plan or issuer classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat any covered care in residential treatment facilities for mental health or substance user disorders as an inpatient benefit." *Id.*

These passages demonstrate that care in an inpatient skilled nursing facility is analogous to care in a residential treatment center—which also provides inpatient care—for purposes of MHPAEA's parity requirement. Although the Final Rules did not provide an exhaustive list of analogues, they describe treatment in skilled nursing facilities and residential treatment centers as "comparable" intermediate services. *Id.* Based on this guidance in the Final Rules, and consistent with caselaw, we conclude Plaintiffs plausibly alleged that care in inpatient skilled nursing facilities and residential treatment centers are analogues for purposes of MHPAEA. *See Danny P.*, 891 F.3d at 1158 & n.6 (implying that treatment at skilled nursing facilities and

32

residential treatment centers is analogous under MHPAEA); *David P.*, 2020 WL 607620, at *17 (same) (quoting *Kurt W.*, 2019 WL 6790823, at *5); *E.M. v. Humana*, No. 2:18-cv-00789, 2019 WL 4696281, at *3 (D. Utah Sept. 26, 2019) (same) (unpublished).

c

Finally, Plaintiffs have plausibly alleged a disparity between the treatment limitations applied to benefits for mental health or substance abuse care compared to those applied to benefits for medical or surgical care. As explained *supra*, Plaintiffs plausibly alleged that Health Net applied acute-care medical necessity criteria to benefits for care in a residential treatment center, which is a subacute care setting. And Plaintiffs further alleged that Health Net "does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions," such as "skilled nursing facilities, inpatient hospice care, and rehabilitation facilities," "to satisfy acute medical necessity criteria." R., Vol. 1, at 23.

Health Net argues Plaintiffs failed to plausibly allege a disparity because they did not identify the subacute medical necessity criteria it applies to the relevant medical or surgical analogues. *See* Aplees.' Resp. Br. at 42–43; *see also* R., Vol. 1, at 164 (concluding Plaintiffs' "only allegation linking Health Net's review to the Plan's treatment of medical/surgical claims is conclusory" and that "[w]ithout a plausible link to benefit claims in the medical/surgical categories, Plaintiffs do not allege a cause of action under the Parity Act" (citing *id.*, Vol. 1, at 23 ¶ 41)). We disagree.

33

The allegation that Health Net applied subacute criteria to analogous medical or surgical care, such as treatment in a skilled nursing facility, is a factual allegation that we must accept as true on Health Net's motion to dismiss.  Examining allegations that the Supreme Court and our Circuit have deemed "factual" rather than "conclusory," *Iqbal*, 556 U.S. at 681, illustrates why Plaintiffs' allegations suffice.

*Iqbal* provides one example.  There, the Court concluded allegations "that petitioners 'knew of, condoned, and willfully and maliciously agreed to subject [the plaintiff]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest,'" were "conclusory" because they "amount[ed] to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Id.* at 680–81 (quoting *Twombly*, 550 U.S. at 555).  By contrast, the following allegations were "factual" and entitled to a presumption of truth: "the [FBI], under the direction of Defendant Mueller, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11"; and "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants Ashcroft and Mueller in discussions in the weeks after September 11, 2001." *Id.* at 681 (emphasis omitted).  The plaintiff did not cite to any evidence supporting the allegations that the FBI had "detained thousands of Arab Muslim men" or that the defendants had approved those detentions. *Id.*  But the Court accepted these

34

allegations as true on a motion to dismiss, without requiring any further detail or substantiation.

Likewise, in *Khalik v. United Air Lines*, we differentiated between conclusory and factual allegations in addressing claims for discrimination, retaliation, and wrongful termination. *See* 671 F.3d at 1193–94. We concluded that several allegations were "conclusory" and not entitled to the assumption of truth, including allegations that:

> (1) [the plaintiff] was targeted because of her race, religion, national origin and ethnic heritage; (2) she was subjected to a false investigation and false criticism; and (3) [the] [d]efendant's stated reasons for the termination and other adverse employment actions were exaggerated and false, giving rise to a presumption of discrimination, retaliation, and wrongful termination.

*Id.* at 1193. By contrast, the following allegations qualified as "facts," the truth of which we assumed:

> (1) Plaintiff is an Arab-American who was born in Kuwait; (2) Plaintiff's religion is Islam; (3) Plaintiff performed her job well; (4) Plaintiff was grabbed by the arm in the office; (5) Plaintiff complained internally about discrimination; (6) Plaintiff also complained internally about being denied FMLA leave; (7) Plaintiff complained about an email that described a criminal act; and (8) Defendant terminated Plaintiff's employment position.

*Id.* at 1193–94. Allegations that, for example, the plaintiff "performed her job well" and "was grabbed by the arm in the office," were unsubstantiated assertions. *See id.* But we accepted these allegations as true without requiring any further support. *See id.*; *see also Gee v. Pacheco*, 627 F.3d 1178, 1188 (10th Cir. 2010) (accepting as true,

35

and finding sufficient to state First Amendment claim, allegations that a prison guard "intentionally, and for the purpose of harassing [the plaintiff], confiscated and destroyed letters sent to him by persons outside the prison 'under the guise' of sticker and perfume violations") (citation omitted).

Plaintiffs' allegation that Health Net applied subacute medical necessity criteria to treatment in a skilled nursing facility, *see* R., Vol. 1, at 23, is akin to the allegations *Iqbal* and *Khalik* deemed "factual." The relevant allegation does not "recit[e]" any "element[]" of a MHPAEA claim. *Iqbal*, 556 U.S. at 681. Rather, it alleges a specific characteristic of the criteria Health Net applies to certain medical or surgical treatments. Nothing in *Iqbal* or *Khalik* suggests that Plaintiffs must further substantiate these allegations by reciting the specific criteria Health Net applies in a medical or surgical setting in order to benefit from the presumption of truth that attaches to factual allegations.[4]

This is not a case where Plaintiffs had ready access to the criteria Health Net applies when assessing coverage at a skilled nursing facility but simply failed to

_____

[4]     Health Net cites to our decision in *Bekkem v. Wilkie*, 915 F.3d 1258, 1275 (10th Cir. 2019), as support for its position that Plaintiffs' allegations are conclusory, *see* Aplees.' Resp. Br. at 42, 46–47. But *Bekkem* merely concluded "it is insufficient for a plaintiff to allege . . . that she did not receive an employment benefit that 'similarly situated' employees received," which is a "legal conclusion" that is not entitled to the presumption of truth on a motion to dismiss. 915 F.3d at 1275 (quoting *Hwang v. Kan. State Univ.*, 753 F.3d 1159, 1164 (10th Cir. 2014)). Here, Plaintiffs do not merely restate the elements of a MHPAEA claim. They allege a "set of facts"—namely, that Health Net applied acute-care medical necessity criteria to benefits for mental health treatment while applying subacute criteria to benefits for medical or surgical treatment—that "plausibly suggest[s] differential treatment." *Id.*

36

allege those criteria in their complaint. ERISA requires plan administrators, "upon written request of any participant or beneficiary, [to] furnish a copy of the . . . instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). "Instruments under which the plan is established or operated include documents with information on medical necessity criteria for both medical/surgical benefits and mental health and substance use disorder benefits . . . ." 29 C.F.R. § 2590.712(d)(3). Invoking their rights under these provisions, Plaintiffs allegedly requested the medical necessity criteria associated with treatment in the analogous medical or surgical settings, but Health Net did *not* produce the relevant information. *See* R., Vol. 1, at 21, 24.[5]

Health Net's refusal to provide the medical necessity criteria Plaintiffs requested further supports our conclusion that Plaintiffs plausibly alleged a disparity. In describing the types of "details" that plaintiffs must "plead to satisfy the plausibility requirement," we have emphasized "details the [p]laintiff should know," which are typically those within the plaintiff's possession or with which the plaintiff has personal experience. *Khalik*, 671 F.3d at 1194 (stating plaintiff should know,

---

[5] ERISA provides a private right of action under which a "participant or beneficiary" may sue an administrator that fails, within thirty days of the request, to provide information that administrators are required to furnish pursuant to 29 U.S.C. § 1024(b)(4). *See* 29 U.S.C. §§ 1132(a)(1)(A), (c)(1). Under the private right of action, a court may award damages "up to $100 a day from the date of such failure or refusal" and "other relief as [the court] deems proper." *Id.* § 1132(c)(1). Nevertheless, Health Net does not argue that plaintiffs must first bring a challenge under § 1132(a)(1)(A) before asserting a claim under MHPAEA when the administrator has failed to provide requested information.

*inter alia*, "who she requested leave from and who denied her," "when she complained about not receiving leave and when she was terminated," "details about how Defendant treated her compared to other non-Arabic or non-Muslim employees," and "the reasons Defendant gave her for termination and why in her belief those reasons were pretextual"). MHPAEA provides a mechanism through which plaintiffs can access the criteria that a plan uses when assessing benefits for analogous medical or surgical care. But Health Net refused to provide that information on Plaintiffs' request. We therefore see no reason why Plaintiffs "should" have "know[n]" the specific criteria that Health Net applies when assessing coverage for treatment at a skilled nursing facility. *Id.*

Health Net nevertheless insists that it did in fact provide the information Plaintiffs requested. *See* Aplees.' Resp. Br. at 49–50. It notes that in Plaintiffs' letter requesting an independent external review dated November 14, 2018, they requested the following:

> a copy of all documents under which the plan is operated on [I.W.'s] behalf. This includes the Certificate of Coverage, any insurance policies in place for the benefits [I.W. was] seeking, any administrative services agreements that exist, and Mental Health/Substance Abuse criteria including Skilled Nursing Facility and Rehabilitation criteria utilized to evaluate the claim.

R., Vol. 32, at 195; *accord id.*, Vol. 5, at 11. Health Net argues that by requesting the "criteria *utilized to evaluate the claim*," Aplees.' Resp. Br. at 49 (quoting R., Vol. 5, at 11 (emphasis added)), Plaintiffs requested information Health Net had already provided in a letter dated June 8, 2018—namely, the InterQual Criteria, *see id.* at 49–

38

50 (citing R., Vol. 10, at 189 (providing the InterQual Criteria in a letter dated June 8, 2018)).[6]

We are unconvinced. Plaintiffs sent their letter requesting an external review *after* Health Net had sent them the InterQual Criteria, so there is a reasonable inference that Plaintiffs were not requesting information they had already received. The letter also explicitly requested criteria used in a "Skilled Nursing Facility and Rehabilitation [facility]," R., Vol. 32, at 195, neither of which are covered in the InterQual Criteria that apply to mental health treatment. And in the same letter, Plaintiffs laid out in detail their apprehension that applying the InterQual Criteria would violate MHPAEA due to disparities with the criteria Health Net applies to medical or surgical treatment, such as that occurring in "skilled nursing facilities." *Id.* at 192–93. Their reference to MHPAEA reinforces their position that they indeed requested the criteria applicable to medical or surgical treatment. "[V]iew[ing] [the allegations] in the light most favorable to" Plaintiffs, *Warnick*, 895 F.3d at 750, there

---

[6]    Plaintiffs argue that considering the letters dated June 8 and November 14, 2018, is impermissible on a Rule 12(b)(6) motion to dismiss. *See* Aplts.' Opening Br. at 34 n.5. However, as Health Net responds, *see* Aplees.' Resp. Br. at 50 n.13, in evaluating whether Plaintiffs have stated a claim under Rule 12(b)(6), courts "may properly rely on . . . materials referenced in Plaintiff[s'] complaint," *see Al-Turki v. Tomsic*, 926 F.3d 610, 621 n.6 (10th Cir. 2019); *see also GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[If a] document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."). The Complaint refers to—and relies on—both the letters of June 8 and November 14, 2018. *See* R., Vol. 1, at 18–19 ¶¶ 17, 19 (citing both letters); *id.* at 24 ¶ 42 (alleging Health Net did not provide "the documents . . . Plaintiffs requested to evaluate medical necessity and MHPAEA compliance"). As such, we may consider the letters on Health Net's motion to dismiss.

is a reasonable inference that Health Net did not comply when Plaintiffs requested the criteria Health Net now faults them for omitting from their complaint.

For the foregoing reasons, we conclude Plaintiffs plausibly alleged the final element of a MHPAEA claim—namely, a disparity between treatment limitations applied to benefits for care at a residential treatment center compared to benefits for analogous medical or surgical care.

**3**

Health Net argues that, even accepting as true Plaintiffs' allegations concerning disparities in coverage based on acuity, Plaintiffs fail to state a claim because applying the InterQual Criteria was ostensibly consistent with MHPAEA regulations. We conclude this argument does not justify dismissal on a Rule 12(b)(6) motion.

Health Net's position stems from MHPAEA regulations that provide examples of circumstances in which a NQTL would not violate the statute. Example 4 addresses a plan that covers "medical/surgical benefits and mental health and substance use disorder benefits" so long as they are "medically appropriate." 29 C.F.R. § 2590.712(c)(4)(iii). The example assumes that "evidentiary standards used in determining whether a treatment is medically appropriate (such as the number of visits or days of coverage) are based on recommendations made by panels of experts with appropriate training and experience" and "are applied in a manner that is based on clinically appropriate standards of care." *Id.* In these circumstances, "the plan complies with [the parity requirement applicable to NQTL] because the

40

processes for developing the evidentiary standards used to determine medical appropriateness and the application of these standards to mental health and substance use disorder benefits are comparable to and are applied no more stringently than for medical/surgical benefits." *Id.* And the Plan is compliant in this example "even if the application of the evidentiary standards does not result in similar . . . benefits utilized for mental health conditions or substance use disorders as it does for any particular medical/surgical condition." *Id.*

Health Net argues Plaintiffs cannot state a claim using their acuity theory because the InterQual Criteria are ostensibly consistent with Example 4 in the regulations. Plaintiffs concede in their complaint that "Health Net applies medical/surgical criteria that are 'based on generally accepted standards of medical practice.'" Aplees.' Resp. Br. at 40 (quoting R., Vol. 1, at 24 ¶ 44). Health Net also claims Plaintiffs have abandoned an argument in their complaint that the InterQual Criteria do not reflect generally accepted standards of care. And they argue other courts have "recognized that InterQual reflects widely accepted, evidence-based industry standards." *Id.* Accordingly, even accepting *arguendo* "that Health Net requires higher acuity for extended mental health residential treatment than extended treatment at medical/surgical facilities," Health Net argues the alleged disparity complies with relevant regulations. *Id.* at 41–42.

Health Net's position is untenable because it would require us to find on a motion to dismiss that the InterQual Criteria qualify as generally accepted standards of care. In doing so, we would impermissibly move beyond Plaintiffs' allegations

41

and view the facts in the light most favorable to Health Net. *Cf. Warnick*, 895 F.3d at 750–51 (explaining courts must accept well-pleaded allegations as true and view them in the light most favorable to the non-moving party on a motion to dismiss).

Contrary to what Health Net suggests, Plaintiffs never abandoned their argument that the InterQual Criteria, in particular, do not qualify as generally accepted standards. They alleged in their complaint that the InterQual Criteria "deviate from generally accepted standards of medical practice." R., Vol. 1, at 24 ¶ 44. In their opposition to Defendants' motion for summary judgment, which only addressed Plaintiffs' ERISA claim (not their MHPAEA claim), Plaintiffs did "not ask the Court to reach" the issue of whether the InterQual Criteria qualify as generally accepted standards because they argued that Health Net violated ERISA "even . . . assum[ing]" the InterQual Criteria are generally accepted. *Id.*, Vol. 2, at 107. But Plaintiffs nevertheless noted "they do not necessarily agree that the InterQual Criteria reflect generally accepted standards of care." *Id.* The district court concluded in granting summary judgment to Health Net on Plaintiffs' *ERISA claim* that the InterQual Criteria qualify as generally accepted standards. *See id.* at 202. However, Health Net does not cite to any authority for the proposition that the district court's finding on a motion for summary judgment concerning a separate claim is relevant in determining whether Plaintiffs stated a claim under MHPAEA on a motion to dismiss, where we must accept their allegations as true.

Accordingly, even assuming *arguendo* that Example 4 would foreclose Plaintiffs' claim were a court to find that the InterQual Criteria qualify as generally

accepted standards, no such finding follows from Plaintiffs' allegations. We therefore reject Health Net's position that Example 4 requires dismissal, and we hold that Plaintiffs have stated a claim under MHPAEA.

**B**

We now turn to Plaintiffs' claim under ERISA challenging Health Net's decision to deny benefits. "ERISA sets minimum standards for employer-sponsored health plans, which may be administered by a separate entity." *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023) (citing 29 U.S.C. § 1001). Administrators such as Health Net are analogous "to the trustee of a common-law trust," and their "benefit determination[s]" constitute "fiduciary act[s]." *Glenn*, 554 U.S. at 111. Acting as fiduciaries, administrators must "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

ERISA also requires administrators to follow specific procedures when denying benefits. *See D.K.*, 67 F.4th at 1236. Administrators generally must "set[] forth the specific reasons" underlying their coverage determinations. 29 U.S.C. § 1133(1). And they must provide an opportunity for a "full and fair review . . . of the decision denying the claim." *Id.* § 1133(2).

Plaintiffs claim Health Net violated ERISA by failing to act solely in I.W.'s interest as a beneficiary and failing to conduct a "full and fair review" upon denying coverage for a portion of I.W.'s stay at Uinta. R., Vol. 1, at 22 ¶ 33 (citing 29 U.S.C. §§ 1104, 1133). The district court granted summary judgment to Health Net, and we

43

review that decision de novo, applying the same standard as the district court. *See*

*LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment &*

*Dependent Life Ins. Plan*, 605 F.3d 789, 795 (10th Cir. 2010).

Courts must generally review ERISA claims challenging benefit denials

"under a *de novo* standard." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,

115 (1989). But "[w]here the plan gives the administrator discretionary authority,"

and "procedural irregularities" did not infect the administrator's decision, "we

employ a deferential standard of review, asking only whether the denial of benefits

was arbitrary and capricious." *LaAsmar*, 605 F.3d at 796 (quoting *Weber v. GE Grp.*

*Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008)).

The district court concluded that Health Net had "discretionary authority to

determine eligibility for benefits or to construe the terms of the plan" and that Health

Net did not commit any procedural errors in denying benefits. R., Vol. 2, at 197

(quoting *Firestone*, 489 U.S. at 115); *see id.* at 201–05. Accordingly, the district

court asked only whether Health Net acted arbitrarily and capriciously in denying

benefits to I.W. On appeal, Plaintiffs do not challenge the standard applied in district

court. We will therefore analyze their ERISA claim under the more deferential

standard.

Under arbitrary and capricious review, we assess whether an administrator's

decision "(1) 'was the result of a reasoned and principled process, (2) is consistent

with any prior interpretations by the plan administrator, (3) is reasonable in light of

any external standards, and (4) is consistent with the purposes of the plan.'" *D.K.*, 67

44

F.4th at 1236 (quoting *Flinders*, 491 F.3d at 1193); *see also Tracy O. v. Anthem Blue Cross Health & Life Ins.*, 807 F. App'x 845, 854 (10th Cir. 2020) (citing *Flinders*, 491 F.3d at 1193).

We will "consider only 'the arguments and evidence before the administrator at the time it made [its] decision,'" *Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004) (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992)), and we will uphold an administrator's decision to deny benefits "so long as it is predicated on a reasoned basis," *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006). "[T]here is no requirement that the basis relied upon be the only logical one or even the superlative one." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (quoting *Adamson*, 455 F.3d at 1212). "It need only be sufficiently supported by facts within [the plan administrator's] knowledge." *Finley*, 379 F.3d at 1176 (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999)).

Plaintiffs challenge the district court's decision on two grounds. First, they contend the district court erroneously refused to address their argument that Health Net failed to consider whether I.W. met the InterQual Criteria pertaining to an eating disorder because Plaintiffs did not present that argument during the administrative appeals process. Second, Plaintiffs argue Health Net's denial letters did not provide a reasoned explanation. We reject both arguments and uphold the district court's decision granting summary judgment to Health Net on Plaintiffs' ERISA claim.

45

**1**

We begin by addressing whether Plaintiffs administratively exhausted their argument pertaining to I.W.'s eating disorder. In its denial letters, Health Net explained that InterQual criteria standards "state that there must be reports within the last week of physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, or suicidal or homicidal ideation." R., Vol. 3, at 107; *see also id.*, Vol. 32, at 197; *id.* at 6. Because these behaviors do not include the InterQual Criteria that apply to an eating disorder, in district court, Plaintiffs argued Health Net arbitrarily and capriciously failed to consider evidence of I.W.'s eating disorder before denying coverage.

The district court refused to consider Plaintiffs' position on grounds that they did not present this issue in their letter requesting an external review. Plaintiffs now challenge that determination on appeal, claiming they presented I.W.'s eating disorder in their administrative appeals such that their argument was properly before the district court. We take the district court's view on this exhaustion issue.

In determining whether an administrator denied benefits arbitrarily and capriciously, "district court[s] generally may consider only the arguments and evidence before the administrator at the time it made [its] decision." *Sandoval*, 967 F.2d at 380. The plaintiff in *Sandoval* had requested benefits in connection with a physical impairment. *See id.* at 381. After the administrator completed its review, the plaintiff filed an ERISA claim arguing that the administrator arbitrarily and capriciously denied his request by failing to consider evidence of his psychological

46

disability. *See id.* We found that the medical reports before the administrator "discussed only [the plaintiff's] physical impairments." *Id.* The reports "d[id] not suggest that [the plaintiff] might be disabled due to psychological impairments," and when "request[ing] review of the initial decision to terminate benefits," the plaintiff's attorney did not "suggest or make a claim for psychological disability." *Id.* Because "[a]n administrator's decision is not arbitrary or capricious for failing to take into account evidence not before it," we held that "[t]he evidence of psychological disability developed long after the review process d[id] not render [the administrator's] decision arbitrary or capricious." *Id.*

In their letter requesting an external review of Health Net's decision to deny benefits, Plaintiffs argued that I.W.'s continued treatment at Uinta was medically necessary due in part to her "history of . . . disordered eating habits." R., Vol. 32, at 194. The letter also presented some evidence showing I.W. struggled with an eating disorder during her time at Uinta.

But Plaintiffs never made the specific "argument" to the administrator that they raised in district court. *Sandoval*, 967 F.2d at 381. That is, they never explicitly argued that Health Net improperly denied benefits by failing to apply the InterQual Criteria related to an eating disorder. To the contrary, Plaintiffs "specifically request[ed]" that the reviewer "*not* utilize the InterQual Criteria" Health Net had applied "in [its] previous reviews." R., Vol. 32, at 168 (emphasis added). As such, during their administrative appeal, Plaintiffs failed to raise the argument they have faulted the administrator for declining to consider. The district court properly chose

47

not to consider that argument once Plaintiffs reached federal court.  *See Sandoval*, 967 F.2d at 380–81; *see also Blair v. Alcatel-Lucent Long-Term Disability Plan*, 688 F. App'x 568, 574–75 (10th Cir. 2017) (concluding that "if [the plaintiff] had wanted [her insurer] to consider [certain diagnostic criteria] . . . in more detail, she should have said so (and provided them) in her in-house appeal").

We recognize this case does not align precisely with the circumstances at issue in *Sandoval*.  Whereas in *Sandoval* the plaintiff did not raise his psychological disability before the administrator at all, *see* 967 F.2d at 381, here, Plaintiffs raised and presented evidence of I.W.'s eating disorder in their appeal to Health Net.  They simply did not make the more specific argument that Health Net failed to apply the InterQual Criteria related to an eating disorder when assessing whether to cover I.W.'s continued treatment at Uinta.

Nevertheless, *Sandoval* readily extends to the circumstances we face here.  As we explained in *Sandoval*, "[t]he district court's responsibility" is to determine "whether the administrator's actions were arbitrary or capricious," not whether the plaintiff is "entitled to . . . benefits."  *Id.*  Thus, *Sandoval* emphasized that district courts must focus only on evidence and arguments plaintiffs "bring . . . to the attention of the administrator."  *Id.*; *cf. Murphy v. Deloitte & Touche Grp. Ins. Plan*, 619 F.3d 1151, 1159 (10th Cir. 2010) ("Because the administrator must base its decision on the materials included in the administrative record, a district court would have no justification for concluding that an administrator abused its discretion by failing to consider materials never submitted to it for inclusion in the administrative

48

record."). Here, Plaintiffs generally raised I.W.'s eating disorder, but they never presented an "argument[]" that Health Net improperly overlooked the InterQual Criteria applicable to an eating disorder. *Sandoval*, 967 F.2d at 381. Because that argument was not before the administrator, the district court properly declined to consider it for the first time during Plaintiffs' federal suit.[7]

**2**

Having determined that the district court properly declined to consider Plaintiffs' argument concerning I.W.'s eating disorder, we turn to what remains of Plaintiffs' ERISA claim. Putting I.W.'s eating disorder aside, Plaintiffs argue Health Net arbitrarily and capriciously denied benefits even when focusing only on the InterQual Criteria that are specific to a serious emotional disturbance. They make two points. First, they argue Health Net incorrectly stated "I.W. 'must' demonstrate one of seven cherry-picked symptoms" from the InterQual Criteria that apply to a serious emotional disturbance, without addressing other criteria that could demonstrate medical necessity. Aplts.' Opening Br. at 51. Second, they contend

---

[7] Plaintiffs argue the district court misunderstood their position pertaining to I.W.'s eating disorder as relying on "*different* InterQual criteria to support their argument that treatment at Uinta was medically necessary." Aplts.' Opening Br. at 42 (quoting R., Vol. 2, at 207) (emphasis added). However, read in context, the district court's opinion clearly addressed Health Net's position that Plaintiffs failed to raise the InterQual Criteria specific to an eating disorder during their administrative appeal. *See* Aplees.' Resp. Br. at 19; *see also* R., Vol. 2, at 206 (addressing Health Net's position "that Plaintiffs' arguments 'regarding InterQual's eating disorder criteria and their alleged "truncat[ion]"—are newly minted for this litigation'" (quoting R., Vol. 2, at 134 (Defs.' Reply in Supp. of Mot. for Summ. J., filed Apr. 16, 2021))).

Health Net denied benefits to I.W. based on "'nothing more than conclusory statements' without any *specific* citation to facts in the record," or any "reasoned analysis" supporting the reviewers' determinations. *Id.* (quoting *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 706 (10th Cir. 2018)). Neither contention has merit.

**a**

As to the first, it is clear to us that the reviewers summarized rather than "cherry[ ]picked" from the InterQual criteria associated with a serious emotional disturbance.[8] Aplts.' Opening Br. at 51. The denial letters stated that under the InterQual Criteria, "there must be reports within the last week of physical altercations, sexually inappropriate behavior, evidence of worsening depression, runaway behavior, self-mutilation, or suicidal or homicidal ideation." R., Vol. 3, at 107. All but one of these criteria map almost precisely onto symptoms or behaviors the InterQual Criteria list in connection with a "[s]erious emotional disturbance." *Compare id.* (denial letter listing "physical altercations," "sexually inappropriate behavior," "runaway behavior," "self-mutilation," and "suicidal or homicidal ideation"), *with id.* at 39–40 (InterQual Criteria listing "[a]ggressive or assaultive behavior," "[s]exually inappropriate" behavior, running "[]away from [a] facility or

---

[8]     Plaintiffs did not raise an argument before the administrator that Health Net failed to apply the InterQual Criteria related to a serious emotional disturbance, either. But Health Net does not argue on appeal that Plaintiffs forfeited this argument, so we consider it on the merits. *See Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1139 (10th Cir. 2010) (concluding a party had "forfeited any forfeiture argument [it] may have [had] on [a particular] issue" and then reaching "the merits").

while on home pass," "[n]onsuicidal self-injury," "[s]uicidal ideation without intent," and "[h]omicidal ideation without intent").

"[E]vidence of worsening depression," *id.* at 144, is not one of the InterQual Criteria but, in substance, it readily encompasses the InterQual Criteria; Health Net merely did not explicitly identify those criteria. For example, Health Net did not explicitly list "[d]epersonalization or derealization," *id.* at 39, which are defined, respectively, as "a change in a person's perception or experience of his/her personal identity" and "the perception or experience of the external world as 'unreal,'" *id.* at 86. Likewise, Health Net did not explicitly list "[h]ypervigilence or paranoia," *id.* at 39, which are defined, respectively, as "a heightened awareness and an increased level of sensitivity to external stimuli," *id.* at 89, and "extreme suspiciousness or the false belief that one is being harassed, harmed, persecuted, or unfairly treated," *id.* at 86. And Health Net did not explicitly list "[p]sychomotor agitation or retardation." *Id.* at 40. The former "refers to excessive motor activity in association with an inner feeling of tension," whereas the latter "refers to a generalized and excessive slowing of movement and speech." *Id.* at 89. These criteria—as well as "[a]ngry outbursts," becoming "[e]asily frustrated and impulsive," and "[p]ersistent rule violations," *id.* at 39, which Health Net also did not list explicitly—fit within the broader category of evidence of worsening depression.

We have concluded that an administrator acts arbitrarily and capriciously when it misapplies plan terms by adopting an unreasonable interpretation, *see McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253, 1263 (10th Cir. 1998), or applying the

51

terms inconsistently, *see also Tracy O.*, 807 F. App'x at 854.  But Plaintiffs do not cite any authority preventing an administrator from outlining medical necessity criteria in the manner Health Net adopted here.

This case is unlike *Owings v. United of Omaha Life Insurance Company*, 873 F.3d 1206 (10th Cir. 2017), where we concluded that an administrator acted arbitrarily and capriciously by misapplying the plan's criteria.  *See id.* at 1213.  In *Owings*, the plan defined a disability as an inability to perform "at least one" material job duty, but the administrator denied disability benefits on grounds that the beneficiary failed to demonstrate that he could not perform "all" such duties.  *Id.*  By contrast, Plaintiffs do not argue that Health Net misinterpreted the meaning of any particular medical-necessity criterion applicable to a serious emotional disturbance.  They argue only that Health Net did not consider all such criteria when denying benefits.  But as we have explained, Health Net's denial letters demonstrate that it did in fact consider all criteria relevant to a serious emotional disturbance even if it did not recite each criterion verbatim.

**b**

Plaintiffs also argue Health Net denied benefits arbitrarily and capriciously because its denial letters "consist of 'nothing more than conclusory statements'" and did not cite "*specific* . . . facts in the record" supporting its decision.  Aplts.' Opening Br. at 51 (quoting *McMillan*, 746 F. App'x at 706).  We disagree.

Plaintiffs specifically contend that Health Net's denial letters did not satisfy its "obligations under ERISA and its regulations."  *Id.* at 50.  As explained previously,

52

when notifying a beneficiary of an initial decision to deny coverage, ERISA requires an administrator to set forth "the specific reasons for such denial." 29 U.S.C. § 1133(1). Regulations specify further that when notifying a beneficiary of an adverse determination based on medical necessity, an administrator typically must provide "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances." 29 C.F.R. § 2560.503-1(g)(1)(v)(B).

Plaintiffs have not demonstrated that Health Net's initial denial letter conflicts with these requirements. In *Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580 (10th Cir. 2019), a panel of this Court concluded that an administrator satisfied its obligation to explain the reasons underlying a denial determination by "cit[ing] lack of medical necessity as the specific reason for each denial," "referenc[ing] the residential-treatment criteria that governed the medical-necessity determination," and "provid[ing] clinical judgment supporting each denial." *Id.* at 589. So too, here. Health Net's initial denial letter laid out the medical-necessity criteria that governed Plaintiffs' claim. *See* R., Vol. 3, at 107. It then applied "clinical judgment" in explaining that, based on medical records provided to Health Net, I.W. was not experiencing "any of [those] symptoms or behaviors." *Id.* The letter also explained that I.W.'s records showed she had "learned many healthy coping skills," and was "working on strategies to control her anxiety," "opening up significantly in therapy," and "beginning to address core issues related to her poor self-image and thinking errors." *Id.* at 107–08. As such, the letter concluded I.W. did "not meet medical

53

necessity criteria" for a residential treatment level of care, which it cited as the basis for denying coverage. *Id.* at 108. Consistent with the panel's reasoning in *Mary D.*, we conclude Health Net adequately explained the basis for its initial denial.

When a beneficiary appeals an adverse determination, the administrator must then conduct a "full and fair review . . . of the decision denying the claim." 29 U.S.C. § 1133(2). To conduct a "full and fair review," an administrator must provide an opportunity for the claimant "to submit written comments, documents, records, and other information relating to the claim," all of which the review must "take[] into account." 29 C.F.R. § 2560.503-1(h)(2)(ii), (iv). And with respect to group health plans, when reviewing adverse benefit determinations premised on lack of medical necessity, the "named fiduciary" must also "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical [necessity]" determination. *Id.* § 2560.503-1(h)(3)(iii).

Plaintiffs do not argue that Health Net's appeal denials conflict with any particular statutory or regulatory provision delineating the requirements of a "full and fair review." 29 U.S.C. § 1133(2). Instead, they rely on two decisions from this Circuit concluding that an administrator failed to conduct a full and fair review by failing to adequately explain the reasons underlying its determinations. Neither decision leads us to the same conclusion here.

First, in a letter filed pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure, Plaintiffs invoke our recent decision in *D.K. v. United Behavioral Health*, 67 F.4th 1224 (10th Cir. 2023). *See* Aplts.' Rule 28(j) Letter (dated May 16, 2023).

The plaintiffs in *D.K.* challenged an insurer's decision to deny coverage for care at a residential treatment center on grounds that the insurer failed to provide a "full and fair review," 67 F.4th at 1236, making two specific arguments. First, they argued the administrator failed to engage with opinions a treating physician had submitted on the patient's behalf. *See id.* Second, the plaintiffs argued the administrator failed to adequately explain the reasons underlying its decision by making conclusory statements without citing to the underlying medical records. *See id.* at 1242.

D.K. began by clarifying the scope of review that applies when determining whether an administrator adequately addressed statements from treating physicians and provided adequate reasoning in denying benefits. Because a "full and fair review" consists of "a 'meaningful dialogue'" between administrators and beneficiaries, we concluded that our review "must focus on the content of the denial letters" themselves. *Id.* (quoting *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003)). Other materials that never reach the beneficiary, such as "plan administrators' notes," fall outside the scope of our review. *Id.*

Focusing only on the insurer's denial letters, *D.K.* first concluded the administrator failed to adequately engage with opinions from the beneficiary's treating physicians, all of whom recommended continued care at a residential treatment center. *See id.* at 1237. Though ERISA does not require outright deference to these opinions, we determined that the administrator acted arbitrarily and capriciously by declining to follow them without any explanation. *See id.*

55

We also concluded the administrator did not adequately explain the reasons underlying its determination because its denial letters rested on "conclusory reasoning" and did not "cite any facts in the medical record." *Id.* at 1242. As we explained, the letters did not refer to the "specific . . . provision[s]" on which the administrator based its denial or provide "the specific reason" underlying its decision. *Id.* at 1243. The letters stated that the beneficiary's "diagnosis and medications did not change extensively from admission . . . to the date of the review," that "the record lacked evidence of self-injurious behavior," and that the beneficiary had "treatment resistant behaviors" and "continued to act out behaviorally." *Id.* at 1242. But "[n]one of these statements were supported by citation to the record or discussed [the beneficiary's] extensive medical history." *Id.* And they could have supported a contrary conclusion that the beneficiary did in fact require "ongoing treatment," but the administrator "simply concluded that they indicated [the beneficiary] could be treated at a lower level of care." *Id.* We therefore found the denial letters "lacked 'any analysis, let alone a reasoned analysis,'" and were therefore "arbitrary." *Id.* (quoting *McMillan*, 746 F. App'x at 706).

We decline to extend *D.K.* to the circumstances presented in this case. Unlike in *D.K.*, Plaintiffs do not argue on appeal that Health Net failed to engage with opinions from I.W.'s treating physicians. They argued in the district court that Health Net's denials "did not acknowledge" letters from I.W.'s treatment team that Plaintiffs submitted as part of their administrative appeal. R., Vol. 2, at 37. But the

district court rejected their argument, *see id.* at 207, and Plaintiffs do not renew it on appeal.

Moreover, Health Net's letters do not suffer from the same deficiencies that amounted to unreasoned denials in *D.K.* Health Net's letters cited to the specific diagnostic criteria—the InterQual Criteria—that it considers when determining whether to continue coverage for care at a residential treatment center. *E.g.*, R., Vol. 3, at 107; *id.*, Vol. 32, at 197; *id.* at 6. "Based on the clinical information provided to [Health Net]," it concluded I.W. had not exhibited any of the symptoms or behaviors within the relevant timeframe that are required to qualify for continued coverage under the InterQual Criteria. *Id.*, Vol. 3, at 107; *accord id.*, Vol. 32, at 197; *id.* at 6. Thus, Health Net explained the basis for its decision to deny coverage in a reasoned manner. The absence of symptoms or behaviors required to establish medical necessity under the InterQual Criteria necessarily implies that I.W. no longer qualified for continued coverage under Health Net's standard. And because Health Net determined I.W. did not satisfy its criteria for continued coverage, unlike *D.K.*, its analysis "could [not] have also supported a finding" that "ongoing treatment" was medically necessary under those same criteria. 67 F.4th at 1242.

Although Health Net did not provide extensive citations to I.W.'s medical records, its findings derived primarily from the *absence* of record evidence supporting continued coverage. Plaintiffs fail to explain what evidence Health Net could have cited to support its conclusion that I.W. did *not* exhibit the requisite symptoms or behaviors. By contrast, the statements we found unsubstantiated in

57

*D.K.* were primarily ones the administrator could have supported with citations to the beneficiary's medical records. For example, we focused on statements that the beneficiary's "diagnosis and medications" remained constant during her time at the residential treatment center and that the beneficiary had "treatment resistant behaviors" and "continued to act out behaviorally." *Id.* These are statements that, if true, presumably derive from medical records the plaintiffs submitted during their administrative appeal and to which the administrator could have cited directly. For these reasons, *D.K.* is inapposite and does not lead us to conclude that Health Net denied benefits arbitrarily and capriciously.

In their appellate briefing, Plaintiffs also rely on one of our unpublished decisions, *McMillan*, which—similar to *D.K.*—concluded that an administrator denied benefits arbitrarily and capriciously because its denial letters did not contain "*any* analysis, let alone" one that was "reasoned." 746 F. App'x at 706. The plaintiff in *McMillan* worked in a position that required substantial travel, but he suffered from ailments that limited his physical mobility. *See id.* at 699, 701. He applied for disability benefits through an employer-sponsored plan under which an "insured was considered totally disabled 'when, [due to injury or illness], [he was] unable to perform all of the essential functions of [his] job.'" *Id.* at 698 (second and third alterations in original) (emphasis omitted). His plan administrator denied benefits through several rounds of appeals, and we concluded the denials were arbitrary and capricious. During initial reviews, the reviewers repeatedly failed to acknowledge that the plaintiff's job duties involved travel. *See id.* at 699–702. Although later

58

reviews eventually acknowledged the travel requirements, they "contain[ed] nothing more than conclusory statements that [the plaintiff] could travel without any discussion whatsoever." *Id.* at 706. We therefore concluded that the denials were "arbitrary and capricious." *Id.*

We do not see Health Net's denials in the same light. In *McMillan*, the reviewers repeatedly failed to acknowledge a critical factor relevant to its coverage determinations, only accounting for the plaintiff's duty to travel—and the extent of travel required—during the final round of administrative appeals. *See id.* at 699–702, 704. Even during the final round, the reviewer failed to explain how the plaintiff could fulfill his travel obligations in light of his physical ailments. *See id.* at 704–05. No similar shortcomings mark Health Net's denial letters. The letters identified the InterQual Criteria applicable to a serious emotional disturbance, which require reports of certain symptoms or behaviors "within the . . . week" immediately preceding the benefit determination. R., Vol. 3, at 107; *accord id.*, Vol. 32, at 197; *id.* at 6. And the letters explained that, based on her medical records, I.W. had not exhibited any such symptoms or behaviors within the relevant period. *See* R., Vol. 3, at 107; *accord id.*, Vol. 32, at 197–98; *id.* at 6. Unlike the administrator in *McMillan*, Health Net did not ignore a key condition governing its coverage determinations. Nor did Health Net rely on unsubstantiated conclusions about I.W.'s medical

condition. We therefore decline to extend *McMillan* to the circumstances presented here.[9]

* * *

Accordingly, we hold that Health Net did not deny benefits arbitrarily and capriciously and that the district court did not err in granting summary judgment to Health Net on Plaintiffs' ERISA claim.

---

[9] Under our precedents, a "lack of substantial evidence" is one factor that may indicate an arbitrary and capricious benefits determination, *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002), but Plaintiffs never explicitly claim a lack of substantial evidence on appeal. They cite to evidence allegedly showing I.W. satisfied certain InterQual Criteria related to an eating disorder, *see* Aplts.' Opening Br. at 47–49, but we have concluded Plaintiffs failed to exhaust their argument concerning I.W.'s eating disorder during the administrative appeal. In any event, none of the evidence they present arose during the week prior to Health Net's coverage determination, when such symptoms or behaviors must arise in order to satisfy the InterQual Criteria; to the contrary, all the evidence they cite arose after February 23, 2017. *See id.* Plaintiffs also state that I.W. displayed symptoms or behaviors that could satisfy the InterQual Criteria specific to a serious emotional disturbance. *See id.* at 51 (claiming I.W.'s records showed she "continued to struggle with depression, anxiety, . . . inappropriate sexual relationships, 'romanticizing' getting high, and self-esteem long into her treatment"). But they do so in a single sentence without any citations to the record, thereby waiving through inadequate briefing any argument that Health Net's determination pertaining to a serious emotional disturbance conflicted with I.W.'s medical records. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."); FED. R. APP. P. 28(a)(8)(A) (providing that appellants "must" support their "argument[s]" with "citations to the authorities and parts of the record on which the appellant relies"). Even assuming they preserved the argument concerning an alleged lack of substantial evidence, we would find it inadequate because they do not demonstrate that any such symptoms or behaviors arose during the week before Health Net denied coverage.

**III**

We conclude by resolving three outstanding motions to seal. Plaintiffs filed two motions, one seeking to seal all forty-one volumes of the appendix and the other requesting to seal Attachment D of their Opening Brief. Volumes 1 and 2 of the Appendix consist of the filings in the district court, and Volumes 3 through 41 contain the prelitigation record that was filed under seal in the district court. Attachment D consists of the InterQual Criteria. The Clerk of Court thereafter ordered the parties to file a joint supplement identifying the documents that required sealing and an accompanying explanation, and the parties filed a joint supplement as directed. In addition, Health Net moved to file its Response Brief in redacted form and to file the unredacted version under seal.

"A party seeking to file court records under seal must overcome a presumption, long supported by courts, that the public has a common-law right of access to judicial records." *Eugene S.*, 663 F.3d at 1135. "To do so, 'the parties must articulate a real and substantial interest that justifies depriving the public of access to the records that inform our decision-making process.'" *Id.* at 1135–36 (quoting *Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011)). Applying these principles, we grant all three motions.

First, we **grant** the motion to file Attachment D under seal. We have held in certain circumstances that the interest in protecting "confidential documents . . . outweighs the public's right of access." *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1047 (10th Cir. 2017). The parties agree that the

61

InterQual Criteria contained in Attachment D "are a proprietary product of Change

Healthcare (formerly McKesson Health Solutions), and Appellees are directed to take

steps to protect the confidentiality of these guidelines as part of their agreement to

use them." Joint Supp. to Aplts.' Mots. for Leave to File Vols. 1 Through 41 of

Aplts.' App. Under Seal at 2. As such, both parties agree Attachment D should

remain under seal as a confidential document. We concur and grant the motion to

seal Attachment D.

Second, we **grant** the parties' joint request to file under seal certain documents

contained in Volumes 1 and 2 of the Appendix. Within Volume 1, the parties request

to file under seal "Defendants' unredacted Motion for Summary Judgment and its

Exhibits 1 and 2." *Id.* at 3. And in Volume 2, the parties seek to file under seal

unredacted versions of:

- Defendants' opposition to Plaintiffs' motion for summary judgment and accompanying Exhibit 1 and affidavit;

- Defendants' reply in support of their motion for summary judgment; and

- The transcript of the summary judgment hearing, dated June 24, 2021.

*Id.* at 4. The parties agree that all these documents contain "non-public, protected

health information drawn from Appellants' medical records." *Id.* at 3; *see also id.* at

4. We have sealed "medical records and other documents containing personal health

information and other confidential information about the parties." *Eugene S.*, 663

F.3d at 1135.  Consistent with *Eugene S.*, we grant the motion to seal the documents specified in Volumes 1 and 2.

Third, we **grant** the motion to seal Volumes 3 through 41 of the Appendix in their entirety.  These volumes contain the prelitigation record in the district court, which consists largely of I.W.'s medical records, including her name, birthdate, and social security number, as well as sensitive information concerning medical incidents.  It also contains other private information about Plaintiffs, such as account numbers and billing information.  And it contains confidential information associated with Health Net, such as insurance contracts and the InterQual Criteria.  We have granted motions to seal similar private, sensitive information, even in quantities approaching the number of volumes at issue here.  *See, e.g.*, *Suture Express, Inc.*, 851 F.3d at 1046–47 (granting motions to seal more than twenty volumes of a joint appendix because they "contain[ed] confidential documents, financial information, and contracts, the confidential nature of which outweighs the public's right of access"); *Eugene S.*, 663 F.3d at 1135–36 (sealing record because it contained "medical records and other documents containing personal health information and other confidential information about the parties").  Applying these precedents, we grant the motion to seal Volumes 3 through 41 of the Appendix.

Finally, we **grant** Health Net's request to file the unredacted version of its Response Brief under seal and to file the unsealed brief in redacted form.  Health Net's redactions cover information that falls in the two categories discussed *supra*—namely, sensitive medical information or confidential information pertaining to the

InterQual Criteria.  For the same reasons we authorize the parties to file Attachment D and the Appendix under seal, Health Net may file its Response brief in redacted form and the unredacted brief under seal.

### IV

For the foregoing reasons, we rule as follows: we **AFFIRM** the district court's decision granting summary judgment to Health Net on Plaintiffs' ERISA claim; we **REVERSE** the district court's judgment finding Plaintiffs failed to state a claim under MHPAEA; and we **REMAND** to the district court for proceedings consistent with this opinion.